NORRIS, Judge.
Louisiana Power and Light (“LP & L”) appeals a judgment denying its reconventional demand for injunctive relief and declaring that its powerline servitude on the Broom-fields’ property was lost by 10 years of non-use. For the reasons expressed, we affirm.

Factual background

The property in question sits on the east side of U.S. Highway 167 near Dodson in Winn Parish. The highway right-of-way extends 50’ each way from the centerline of the road. The record does not say when it was built, but a barbed wire fence now stands on the east boundary of the highway right-of-way.
By eight separate instruments executed in 1955, LP & L acquired its powerline servitude from the then-owners of the property. Three of the instruments specified that the servitude would be 16' wide, measured from the edge of the highway right-of-way, and would run parallel with and adjacent to the east side of the highway. These three instruments also granted LP & L the right to construct, operate and maintain electric transmission lines, including poles, wires and other appurtenances, and “to trim and cut trees and other growth so as to keep the wires cleared upon, over and across” the property. The other five instruments did not state the width of the servitude, but at the hearing for preliminary injunction Mr. W.R. Roberts Jr., LP & L’s senior right-of-way agent, testified that the original servitude was 16'. Supp., 4. These five instruments also gave LP & L the right to trim not only foliage on the servitude itself but “to cut any *1377 trees that in failing would reach the wires.” In accord with these instruments, LP & L installed an 8 Kv transmission line. The poles supporting this line sat a foot or two to the east.of the highway right-of-way, inside the fence and on the subject property.
By five separate instruments dated 1956, 1959 and 1967, Mr. and Mrs. Broomfield' bought the property. Mrs. Broomfield testified that when they did so, the transmission line and poles were inside the fence. In May 1968 the Broomfields applied to LP & L for electric service. To provide this LP & L added a pole, which it refers to as a “dual purpose” pole, along the powerline. This pole diverted a service line across the ser-vient estate to the Broomfields’ house and also helped to hold up the transmission line.
In 1972, to service a plant north on Hwy. 167, LP & L decided to upgrade its transmission line to 13 Kv. According to Mr. Roberts, this required an extra 15' of servitude to maintain line clearance from the trees. LP & L asked the property owners along the highway to grant this, and all agreed except the Broomfields, with whom LP & L could not come to terms. LP & L installed the new line, but moved its existing transmission poles a few feet to the west, in front of the Broomfields’ property. After this, the transmission line and all its supporting poles have stood outside the fence and off the servitude area. The service pole, however, remains inside the fence, without holding up the transmission line. It supports only the service line to the Broomfields’ house. Since 1972, no transmission line has passed over, or transmission pole stood upon, the servitude area.
The only point of genuine dispute at trial was what the parties did over the next 16 years. The Broomfields planted a large stand of pine trees several feet back from the fence. See the photos, Ex. LP & L-7 in globo. These obviously grew and the limbs would tend to reach the transmission line. Mr. Roberts testified that his men inspected the entire line once or twice a year and never found, until January 1988, that the trees posed any danger to the line. R.p. 55. Mrs. Broomfield, however, testified that LP & L did nothing, and it was her husband who trimmed the branches and cleared the brush periodically to protect the line. R.p. 49.
After the freeze of January 1988, LP & L sent a crew to trim pine branches along the line. Although the Broomfields protested, the crew trimmed branches from several of their trees. Mrs. Broomfield claimed that 38 trees were thus “damaged,” though LP & L’s timber expert, Mr. Merlin Smith, counted that only 26 trees were trimmed. LP & L’s maintenance foreman, Mr. Jerry Smith, admitted that the crew trimmed the entire 16' servitude plus a little beyond. R.p. 57. Mrs. Broomfield called the sheriff when LP & L showed up to do some more trimming. Mr. Broomfield had a heart attack and died about two weeks later.

Procedural history

Mrs. Broomfield and her children filed suit in January 1989 seeking damages for the trimmed trees. LP & L reconvened, seeking an injunction to keep the Broomfields from interfering with their tree trimming, or a declaratory judgment to interpret the 1955 servitude agreements. In March 1989, after a hearing, the trial court granted LP & L a preliminary injunction, but allowed it to cut only “directly above and west of the Broom-field fence and around the service pole.” R.p. 17. LP & L then moved for a partial summary judgment to declare that it could trim and cut the entire 16' servitude area. Summary judgment was not pursued; trial on the merits was held in February 1991.
By written reasons the trial court took up the reconvention first. The court quoted the 1955 servitude agreements; these granted LP & L the right to construct “transmission lines, including poles, wires and other appurtenances.” However, the' court found that poles are really just an accessory to the right to transmit electric power. Hanks v. Gulf States Util., 253 La. 946, 221 So.2d 249, 251 (1969). The court found that the one service pole on the servitude area of the Broomfields’ property since 1972 did not amount to use of the servitude for 10 years. La.C.C. art. 753. The court also rejected any application of the doctrine of St. Julien v. Morgan La. & Texas R., 35 La.Ann. 924 (1883), because LP & L did not prove the *1378 requisite occupation of the Broomfields’ property. Finally, the court dismissed the Broomfields’ principal claim, finding inadequate proof of damages.
Strictly speaking, the judgment only rejects LP & L’s claim for injunctive relief and declaratory judgment (as well as the Broom-fields’ claim for damages), but in effect it declares the servitude lost to nonuse. LP & L has appealed.

Applicable law

A predial servitude is defined as a charge on a servient estate for the benefit of a dominant estate. La.C.C. art. 646.[1] A predial servitude is extinguished by nonuse for 10 years. La.C.C. art. 753. Under current law, a powerline servitude is defined as an “affirmative servitude” as it gives the owner of the dominant estate the right to do a certain thing, transmit electricity, on the servient estate. La.C.C. art. 706. For an affirmative servitude, prescription of nonuse begins to run from the date of its last use. La.C.C. art. 754. Under prior law, a power-line servitude was classified as a “discontinuous servitude,” as it required an act of man to be exercised. La.C.C. art. 727 (1870); Lake v. Louisiana Power & Light, 330 So.2d 914 (La.1976). The nonuse of a discontinuous servitude began “from the day they ceased to be used.” La.C.C. art. 790 (1870). In the instant case the servitude agreements were executed and the alleged nonuse began under the old law, and the alleged nonuse accrued after the new law took effect in 1978. La. Acts 1977, No. 514. Strictly speaking, the new law cannot be applied retroactively. See Daniel v. Department of Trans. & Dev., 396 So.2d 967 (La.App. 1st Cir.), writ denied 400 So.2d 1385 (La.1981). Under either scheme, however, nonuse is measured from the date of last use of the servitude, and the issue presented is whether LP & L’s activity since 1972 amounts to use.
A partial use of the servitude constitutes use of the whole. La.C.C. art. 759. However, the use of a right that is only accessory to the servitude is not use of the servitude. La.C.C. art. 761. The lead case for defining the nature of a powerline servitude is Hanks v. Gulf States Util., supra. There the property owners granted a utility company the right to build “poles, frames or towers * * * with lines of wires” for the transmission of electricity. Although this entitled the utility company to erect an H-frame transmission line, for over 10 years the company maintained only a single-pole transmission line on the servient estate. The property owners argued that the utility lost the right to construct an H-frame tower because of nonuse. The Supreme Court found the utility’s conduct sufficient use of the servitude to block prescription of nonuse. “The right to transmit electric power is the servitude. ” Id., 221 So.2d at 251 (emphasis in original). By contrast, poles, frames and towers are “merely types of supporting structure for transmission lines or other transmitting devices.” Id. In McGuire v. Central La. Elec. Co., 337 So.2d 1070 (La.1976), the Court held that the right to enter the servient estate to cut and trim trees and shrubs for clearance is only an accessory to the grant of the servitude to transmit electricity. Id., at 1073.
Doubt as to the existence, extent or manner of exercise of a predial servitude shall be resolved in favor of the servient estate. La. C.C. art. 730.

Discussion

On appeal LP <& L urges that it has used, or at least partially used, its servitude because the “dual purpose” service pole and service line to the Broomfields’ house has been present on the servitude area since 1968. LP & L also argues that it has maintained clearance over the servitude property in conjunction with the transmission of electric power and this amounts to use of the servitude, even though the precise location of the line is not on the servient estate. LP & L finally cites public policy considerations that militate against requiring it to prove “that someone passed over every square foot at least once in ten years.” We would note that LP & L never did anything to evidence an intent to abandon its servitude over the Broomfields’ property.
*1379 The trial court was not plainly wrong to dispose of LP & L’s first argument and find that the service pole and line to the Broomfields’ house was not in fact use of the servitude. Four of the eight servitude instruments state that the purpose is to “construct 8 Kv line along U.S. Hwy. No. 167,” and the others label it the “Dodson-Winns-boro Tie-Line.” Since 1972 LP & L has not maintained such a north-south transmission line, either of 8 or 13 Kv, on the servitude property. Admittedly, between 1968 and 1972 the “dual purpose” pole could have been considered part of the transmission line, but it is doubtful that since 1972 this pole has satisfied the manner of exercise contemplated in the servitude instruments. La.C.C. art. 730. Moreover, it is definitely not an “integral” or essential part of the 13 Kv line, thus distinguishing the case of Brooks v. New Orleans Pub. Serv. Inc., 370 So.2d 686 (La. App. 4th Cir.), writ denied 373 So.2d 512 (La.1979), relied on by LP & L in brief. In Brooks, the guy pole was found to be an integral part of the transmission line.
For the second argument, LP & L urges us to adopt the reasoning that although it transmitted electricity off the servitude area since 1972, it continued to utilize that area for clearance purposes, thereby maintaining its servitude. The gist of the argument is that their acts of maintaining clearance on the 16' strip constituted use of the servitude. Safety concerns require adequate clearance around an uninsulated line. See Levi v. Southwest La. Elec. Membership Coop., 542 So.2d 1081 (La.1989). Mr. Roberts, the senior right-of-way agent, testified that LP & L likes to have a 30' clearance on each side of its 13 Kv lines. R.p. 53. By moving the line outside the Broomfields’ fence in 1972, LP & L made 20' of clearance between the powerline and the east edge of the servitude line. If the right to transmit electric power includes the right to transmit it safely, the argument runs, then maintaining the necessary clearance is an exercise of the right, even if the actual line is off the servitude area. LP & L adds that it should not be penalized with nonuse simply because it never, until January 1988, had to physically create a clearance on the servitude.
We do not agree. The definition of a predial servitude requires it to be a charge on a servient estate. La.C.C. art. 646. The right to transmit electricity is the basis of the servitude. Hanks v. Gulf States Util., supra. It is obvious that LP & L has not transmitted electricity on the servient estate in a manner consistent with the servitude instruments since 1972. This point is critical because of the distinction between the servitude itself and its accessory rights.
While we recognize the safety considerations cited by LP & L, we must hold that the right to maintain reasonable clearance around a powerline is merely an accessory of the servitude. McGuire v. Central La. Elec. Co., supra. Use of an accessory right does not constitute use of the servitude itself. La.C.C. art. 761.
The Revision Comments to art. 761 give an example that is precisely on point:
[I]f one who has the servitude of drawing water from the well of his neighbor passes over the servient estate and goes to the well without drawing any water during the period required for prescription, he will lose the servitude because the passage is merely accessory to the right of drawing water.
The fundamental flaw in LP & L’s position is that, as the district court found, there has been no exercise, upon the servient estate, of the principal right to transmit electricity since 1972. Without this, LP & L’s claim to have exercised the accessory right of clearance is as unavailing as that of the water-drawer in the Comment. Performing some acts on the servient estate will not block prescription unless the principal servitude right is also exercised thereon. LP & L’s argument lacks merit. The further claim of public policy considerations does not alter this conclusion.
Although LP & L does not specifically contest it on appeal, the trial court further found that the proven use of the servitude was not sufficient to activate the St. Julien doctrine. St. Julien, supra; La.R.S. 19:14. On the record presented, this finding is not manifestly erroneous.

*1380
Conclusion

For the reasons expressed, the judgment is affirmed. Costs are assessed to Louisiana Power and Light.
AFFIRMED.

. Citations are to Civil Code articles after the 1977 revision unless otherwise indicated. The only relevant changes in the law are those noted in the discussion.